**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JASON SCOTT BYRAM,
            *Petitioner-Appellant,*

v.

JON E. OZMINT, Director, South
Carolina Department of Corrections;
HENRY DARGAN MCMASTER,
Attorney General, State of South
Carolina,

            *Respondents-Appellees.*

No. 02-24

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Margaret B. Seymour, District Judge.
(CA-02-545-6-24AK)

Argued: February 27, 2003

Decided: August 6, 2003

Before WIDENER, WILKINSON, and NIEMEYER,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Widener and Judge Niemeyer joined.

**COUNSEL**

**ARGUED:** John Dewey Elliott, LAW OFFICE OF JOHN D.
ELLIOTT, Columbia, South Carolina; George Raymond McElveen,

III, MCELVEEN & MCELVEEN, Columbia, South Carolina, for Appellant. William Edgar Salter, III, Senior Assistant Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

Appellant Jason Scott Byram was convicted by a South Carolina jury of murder, first degree burglary, attempted armed robbery, and grand larceny of a motor vehicle. He was sentenced to death for the murder, as well as to life, twenty, and ten year terms of imprisonment for his other crimes. After exhausting state remedies, Byram petitioned the United States District Court for the District of South Carolina for a writ of habeas corpus under 28 U.S.C. § 2254. The district court rejected his claims, but issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c). Byram now appeals the district court's dismissal of his petition. We affirm.

I.

On Sunday, May 23, 1993, at approximately 3:00 a.m., Julie Johnson, a school teacher and mother of three, was robbed and murdered in her home. The assailant broke into Johnson's home, stole her handbag and van, and stabbed her to death with her own butcher knife. Before dying, Mrs. Johnson indicated to her husband and the police that she was attacked by an individual acting alone.

Police investigating the murder found Jason Scott Byram's fingerprint at the crime scene and arrested Byram the afternoon of May 23. After being informed of his rights and signing a written waiver, Byram gave a statement to the police in which he admitted entering the victim's home and stabbing her to keep her quiet. The trial court held a hearing on the admissibility of Byram's confession and held that the statements were freely, knowingly, and voluntarily made.

Byram told the police that he had an accomplice named "Jim" whom he had met the previous evening outside a bar in the area. The police investigated this claim but found no evidence that anyone matching Jim's description had been in the area that night.

At trial, an individual who rented a room in the same boarding house as Byram testified that he saw Byram in a white van on May 23. The witness stated that Byram had blood on his shirt and that when asked about the van, Byram said it belonged to a friend and not to tell anyone about it. The witness also testified that no one was in the van with Byram.

Byram was represented at trial by Douglas Strickler as lead counsel and public defender Lee Coggiola as second counsel. Strickler had previously tried more than ten non-capital murder cases and participated in two death penalty cases. He had also represented a death row petitioner for post-conviction relief (PCR). Coggiola had tried several major felony cases before being appointed to represent Byram. In addition, she had work experience at the Death Penalty Resource Center. Strickler's time records show that he spent approximately 623.5 hours preparing Byram's case. Although Coggiola did not document the amount of time she devoted to preparation, she testified that she met with Byram at least thirty times before trial.

On March 7, 1995, Byram was convicted by a jury in Columbia, South Carolina of murder, first-degree burglary, attempted armed robbery, and grand larceny of a motor vehicle. During the sentencing phase of the trial, the defense presented mitigating evidence. Trial counsel retained forensic psychiatrist Dr. Donald Morgan and forensic psychologist Dr. Geoff McKee to evaluate Byram and to determine if Byram possibly suffered from any brain damage. Evelyn Califf, a social worker, and investigator Patti Rickborn also assisted Coggiola in preparing the mitigation evidence. Califf testified that she met with Byram five times and that she reviewed Byram's school records and a summary of his foster care placements. Rickborn contacted several of Byram's natural and adoptive family members and helped Strickler obtain records pertaining to Byram's adoption in Alabama.

The trial court qualified Califf as an expert in the area of adoptions and learning disabilities. During the sentencing phase of the trial,

Califf testified about Byram's troubled childhood and adolescence. She related details of his early family life in an abusive home and the fact that he was slow to develop as a young child. Califf also reported that Byram had difficulties in school and that his intelligence was in the "dull normal" range.

Despite the mitigation evidence presented by defense counsel, the jury recommended imposition of the death penalty. The trial judge reviewed this recommendation and determined that the evidence justified the punishment in this case and that the recommendation was not the result of prejudice, passion or any other arbitrary factor. The trial court therefore sentenced Byram to death.

The South Carolina Supreme Court affirmed Byram's conviction and sentence on April 28, 1997. *State v. Byram*, 485 S.E.2d 360 (S.C. 1997), *rehearing denied* (May 21, 1997). Byram then filed for state post-conviction relief. After a hearing, the South Carolina Circuit Court denied Byram's request for relief. Byram then filed a petition with the South Carolina Supreme Court, which the court denied on January 11, 2002. Byram next filed a petition for writ of habeas corpus with the United States District Court for the District of South Carolina. Respondents filed a motion for summary judgment on March 22, 2002, and the matter was referred to a United States magistrate judge. The magistrate judge recommended dismissal. On October 2, 2002, the district court entered an order granting summary judgement in favor of the State, but the district court issued a certificate of appealability concerning his claims on January 10, 2003. Byram now appeals the district court's decision.

## II.

If a state court has already resolved the merits of a claim for post-conviction relief, a federal court may not grant a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2000). A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is

contrary to clearly established Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Id.* at 406. Lastly, a state court decision involves an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

In this case, Byram argues (1) that he was deprived of effective assistance of counsel during the jury selection process because his defense team used peremptory challenges to strike potential jurors for reasons of race; and (2) that he was deprived of effective assistance of counsel during the sentencing phase of trial because his lawyers failed to present a sufficient case in mitigation of his sentence. The district court found that it was not unreasonable for the state PCR court to deny these federal claims.

### III.

Byram argues that he received ineffective assistance of counsel because his own defense counsel improperly selected jurors in violation of the Fourteenth Amendment. At trial, defense counsel exercised nine out of ten peremptory strikes to exclude white jurors from the venire and an additional four challenges to remove white jury alternates. Byram contends that these strikes were based on the improper consideration of race in jury selection.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), and *Georgia v. McCollum*, 505 U.S. 42 (1992), the Supreme Court held that it was constitutionally impermissible for either the prosecution or the defense to use race-based peremptory strikes. The Court set out a three step framework for determining when a *Batson* violation has occurred. First, the opponent of the strike must make a prima facie showing that a strike was exercised on the basis of a juror's race. *Miller-El*, 123 S. Ct. at 1040. Once this threshold showing has been made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for removing the juror in question. *Id.* If such a race-neutral reason is articulated, the trial court must then determine whether the opponent of the strike has sufficiently rebutted this explanation and proven

purposeful discrimination on the part of the individual exercising the peremptory strike. *Id.*

Trial counsel Strickler testified at the PCR hearing that he was aware of statistical studies that show African American jurors tend to vote for the death penalty less often than jurors of other races. When asked whether he had a personal opinion as to whether African American jurors are actually more lenient than white jurors, Strickler replied:

> I have an opinion based on voir dire examinations in a number of capital cases which is far and away African American jurors exclude themselves from even being able to participate in the process at a far higher rate. In other words, my opinion is that African American jurors — that those African American jurors who have a sincere opposition to capital punishment will express it and will not participate as opposed to white jurors who have or any juror actually who has a sincere belief in the appropriateness of capital punishment in all cases, being unwilling to state that and thereby disqualify themselves.

Additionally, Byram contends that Strickler's trial notes specifically indicate whether certain members of the venire were black or white. We review this claim on the merits under the deferential AEDPA standard.

In *Batson* inquiries, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Miller-El*, 123 S. Ct. at 1041. Because there is rarely any direct evidence of the attorney's state of mind when he made the challenge, "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* This type of credibility assessment lies "peculiarly within a trial judge's province. *Id.* (internal citations omitted).

At Byram's trial, the State requested a *Batson* hearing to determine the reasons for defense counsel's peremptory challenges of white jurors. During the hearing, Strickler denied that the challenges were racially motivated and stated that jury selection was based on defense

counsel's impressions of the responses given by potential jurors. Strickler explained that defense counsel used a rating system for each juror and attempted to seat those jurors who scored higher on the scale. The Solicitor was dissatisfied with this explanation, and the trial judge accordingly asked Strickler to give the reason for each individual strike.

Strickler stated that he struck juror Page because she responded strongly when the trial court asked about her willingness to impose the death penalty and because she had children in school where the victim had been a teacher. Strickler asserted that he struck juror Pregnall because he answered the question about his ability to impose the death penalty quickly but hesitated when responding to the question of whether he would be able to impose a life sentence. Similarly, Strickler stated that he struck juror Neely because he did not hesitate when asked about his willingness to impose a death sentence, but seemed hesitant to impose a life sentence or to consider mitigating circumstances. And juror Walker was removed from the pool because he did not hesitate when asked whether he could impose a death sentence but responded less quickly when asked about his ability to return a life sentence.

Juror Dansby was struck, according to Strickler, because he had never before served on a jury, because he lived near the family of the victim, and because trial counsel perceived him as more likely to vote for the death penalty. Juror Amidon was struck because he knew the Solicitor's father, and juror Head was struck because he worked with the victim's husband. Strickler stated that he struck juror Roof because it appeared that she had trouble understanding the questions at voir dire and that he struck juror Brown because he was "strong" on death.

The trial judge ultimately ruled that there was not sufficient indication of a racial motivation to quash the panel. Based on his first hand observations of defense counsel, the trial court decided to credit Strickler's explanations for the peremptory strikes. A court reviewing such a decision from a sterile record must give great deference to the trial court's determination and may grant habeas relief only if the trial court's determination was objectively unreasonable. *Miller-El*, 123 S. Ct. at 1041.

We find that the state court in this case did not unreasonably apply *Batson* to the facts presented. A juror's inclination to impose the death penalty is a legitimate consideration in counsel's exercise of peremptory challenges. *United States v. Barnette*, 211 F.3d 803, 811 (4th Cir. 2000). And the trial court's ruling that this proper consideration was the basis of a strategic decision by defense counsel will not be disturbed without evidence to the contrary. Accordingly, we affirm the district court's determination that Byram was not denied effective assistance of counsel with respect to this claim. The trial court's application of *Batson* was neither contrary to, nor an unreasonable application of, clearly established federal law.

## IV.

Byram additionally argues that his trial counsel's performance at sentencing was ineffective because counsel did not have a coherent strategy for developing all available mitigation evidence. Byram contends that the absence of a strategy resulted in counsel's failure to present factual evidence about his childhood that would have alerted the jury to the traumatic circumstances of his youth, including evidence that he suffered brain damage as a result of fetal alcohol syndrome (FAS) and evidence that he suffered abuse and neglect as a child. According to Byram, this failure deprived him of his Sixth Amendment right to effective representation during the penalty phase of his trial, undermining confidence in the outcome of that phase of the proceedings.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set out a two-part test for evaluating ineffective assistance of counsel claims. First, the defendant "must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. In order to show this deficiency, the defendant must produce evidence that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Less than complete investigations may form the basis for strategic choices, so long as "'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 123 S. Ct. 2527, 2541 (2003)(quoting *Strickland*, 466 U.S. at 690-91).

Second, the defendant must show that the deficient performance resulted in actual prejudice to his case. A showing of prejudice

requires the defendant to prove that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. In the context of a capital sentencing proceeding, the question is whether "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Wiggins*, 123 S. Ct. at 2542 (quoting *Strickland*, 466 U.S. at 694). Assessing prejudice requires this Court to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 123 S. Ct. at 2542. In order to determine whether South Carolina state courts applied federal law concerning the ineffective performance of counsel in an unreasonable way, we undertake a preliminary consideration of this two part test. *See Miller-El*, 123 S. Ct. at 1040.

It is the responsibility of counsel to adequately investigate and present evidence in mitigation of guilt. *Williams v. Taylor*, 529 U.S. at 395. However, counsel is only required to make a reasonable investigation for possible mitigating evidence. *Matthews v. Evatt*, 105 F.3d 907, 919 (4th Cir. 1997). Moreover, review of counsel's strategic decisions as to which evidence to present at trial is "highly deferential," and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Byram has not shown that his counsel's performance fell below an objective standard of reasonableness. In fact, the record shows that both Strickler and Coggiola spent a substantial amount of time preparing Byram's case. Strickler logged 623.5 hours of pre-trial preparation and Coggiola testified that she met with Byram at least thirty times before trial. As part of their pre-trial preparation, they retained a forensic psychologist and a forensic psychiatrist, Drs. Morgan and McKee. The experts conducted EEG and MRI tests on Byram to determine whether he suffered from any organic brain damage. Coggiola testified that she carefully reviewed the psychiatric findings with Strickler, and that the lawyers decided that the suggestions of antisocial behavior that McKee and Morgan found could have been harmful to Byram's defense. Based upon the information and evaluations, counsel decided not to present the experts' testimony. This strategic decision not to present psychological evidence was a reasonable one because such evidence "is a double-edged sword that might as easily have condemned [defendant] to death as excused his actions."

*Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998). And a failure to 'shop around' for a favorable expert opinion after an evaluation yields little in mitigating evidence does not constitute ineffective assistance. *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992).

Unlike in *Wiggins*, 123 S. Ct. at 2537, 2538, where counsel fell far short of "well-defined norms" requiring the discovery of "*all reasonably available* mitigating evidence" and "chose to abandon their investigation at an unreasonable juncture," counsel here spent considerable time developing a picture of Byram's life. Trial counsel retained social worker Evelyn Califf to present a psychosocial assessment of Byram during the sentencing phase of the trial and hired private investigator Patti Rickborn to help develop the mitigation case. Califf testified that she met with Byram five times before trial, reviewed Byram's adoption and school records from Alabama, and interviewed Byram's adoptive family members. Rickborn contacted several of Byram's natural and adoptive family members, including Byram's birth mother, Olae Mae Chandler. In order to investigate Byram's claim of FAS, Rickborn asked Chandler about possible alcohol abuse during her pregnancy, which she denied. The EEG and MRI tests showed no evidence of FAS, and nothing in the birth mother's medical records indicated alcohol consumption during pregnancy. Based upon Rickborn's investigation and the absence of any evidence of organic brain dysfunction, trial counsel concluded that they did not have a sufficient factual basis to present FAS as evidence in mitigation.

Despite this thorough investigation, Byram faults trial counsel for failing to obtain his adoption records, which might have provided more evidence that he suffered from FAS and more evidence of early childhood trauma. A failure to obtain available records, however, does not show that counsel's investigation was inadequate. *Jones v. Murray*, 947 F.2d 1106, 1114 (4th Cir. 1991). Attorneys will not be found ineffective unless they fail to "make a *reasonable* investigation for possible mitigating evidence." *Matthews v. Evatt*, 105 F.3d at 919 (emphasis added). And "the reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must

concentrate his efforts on the strongest arguments in favor of mitigation." *McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002).

Rickborn did obtain some records concerning Byram's adoption and made reasonable efforts to obtain his actual adoption records. Strickler also attempted to obtain the records. He traveled to Alabama to try to get social worker files concerning Byram's early years in foster care and in adoption, but was unsuccessful. Although PCR counsel did eventually manage to obtain the records, the PCR hearing had to be continued several times because PCR counsel could not obtain the records. The state PCR court found that trial counsel had "devoted extraordinary time and effort in developing the case in mitigation" and "articulated credible explanations for their strategic decisions for developing the mitigation case that they ultimately presented." The PCR court determined that "counsel's assistance was reasonable under prevailing norms of professional conduct" and that the decision to stop pursuing FAS evidence was a matter of sound trial strategy.

Moreover, even if additional information or records on Byram's childhood could have been obtained, this is "not a case where counsel's failure to thoroughly investigate kept the jury completely in the dark as to [defendant's] alleged mental problems." *McWee v. Weldon*, 283 F.3d at 189. This situation is different from that in *Wiggins* where counsel, during the penalty phase of trial, focused on contesting guilt rather than presenting evidence in mitigation. *Wiggins*, 123 S. Ct. at 2538. Counsel in *Wiggins* presented "a halfhearted mitigation case," *id.* at 2538, while in the present case the jury heard extensive testimony and arguments regarding Byram's troubled childhood and adolescence. Califf testified that Byram weighed only three pounds at birth and was developmentally delayed as a baby. She presented evidence that Byram's records reflected at least six changes in custody before he was adopted at age four, that Byram's actions suggested that he was physically abused in his past, and that Byram's adoptive parents suffered marital difficulties. She specifically noted that Byram had emotional difficulties as a young child and that his multiple foster care placements might have made it difficult for him to form bonds. Califf further testified that Byram possibly suffered from attention deficit disorder or hyperactivity as a child, and that Byram tested in the dull normal range for intelligence.

In light of the wealth of information presented by trial counsel, additional information about Byram's childhood would have added little. There was no "reasonable probability" that the outcome would have been different had trial counsel conducted an even more exhaustive investigation into Byram's background. Indeed, the evidence presented before the PCR court was largely cumulative. And Byram offers no evidence to support his claim that greater supervision of Califf or better communication between the members of his defense team would have produced a different result in his case. Therefore, Byram has failed to show that the state courts of South Carolina applied clearly established federal law concerning the ineffective performance of counsel in an unreasonable way.

## V.

We therefore affirm the district court's dismissal of Byram's petition.

*AFFIRMED*.