# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-2456

_____

Justin Anderson

*Plaintiff - Appellant*

v.

Wendy Kelley, Director, Arkansas Department of Correction, originally identified
as Ray Hobbs

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: June 12, 2019
Filed: September 11, 2019

_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Justin Anderson appeals the district court's[1] denial of his petition for habeas corpus. He argues that his counsel was ineffective for failing to investigate and

_____

[1]The Honorable D. P. Marshall Jr., United States District Judge for the Eastern District of Arkansas.

present mental health evidence and for giving the jury an expert report which included information that Anderson was on death row, that a mid-deliberation jury instruction was improper, and that he is categorically exempt from the death penalty. We affirm.

## I.

Anderson was nineteen when he broke into a truck occupied by Roger Solvey in October 2000. Anderson shot Solvey, but he survived. Six days later, Anderson shot and killed eighty-seven-year-old Clara Creech while she was gardening in her yard. Anderson admitted to shooting Solvey, and he was convicted of attempted capital murder. A jury then convicted Anderson of capital murder for killing Creech.

Latrece Gray represented Anderson during the penalty phase. She testified that the focus of her defense was "childhood matters." The defense presented eighteen witnesses, including psychiatric expert Dr. Andre Derdeyn, who testified about Anderson's abusive childhood. Dr. Derdeyn diagnosed Anderson with a "major depressive episode" and agreed that Anderson had anti-social personality disorder. The jury was instructed on forty-two mitigating factors and told it could consider any other mitigating circumstance. It found that none of the mitigating factors "probably existed," and it found one aggravating circumstance—that Anderson "previously committed another felony," the attempted murder of Solvey, "an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person." The jury sentenced him to death in 2002. The Arkansas Supreme Court reversed and remanded for resentencing because it determined that the jury "eliminated from its consideration all evidence presented of mitigating circumstances." *Anderson v. State*, 163 S.W.3d 333, 360 (Ark. 2004).

The second penalty phase team included Gray, a mitigation specialist, a paralegal, and several other attorneys. The team also consulted other attorneys at various points. They concluded that their initial strategy had not worked because the jury found no mitigating factors and decided to go "back to the drawing board." As Gray later testified, she and her team "presented the mitigation in a different fashion in the hopes to drive home to the jury that there were mitigating factors." The team prepared a twenty-four-page mitigation table that detailed the potential witnesses to testify on Anderson's behalf, a summary of their expected testimony, and the relevant exhibits to each witness. They presented thirteen witnesses, including Anderson, who had not testified during his first penalty phase.[2] He admitted to and took responsibility for killing Creech. He also testified about a letter he had written to his father while in prison and highlighted his personal accomplishments in prison, such as earning a GED.

The team consulted several experts, including psychologists and psychiatrists. They hired Dr. Rebecca Caperton, who specialized in mental functioning and IQ testing, and Dr. Elizabeth Speck-Kern, who specialized in neuropsychology and learning disabilities. The team otherwise did not request neuropsychological testing, did not have Anderson screened for post traumatic stress disorder ("PTSD"), and did not consult with an expert about the biological limitations of teenage brain development.

In her closing statement, Gray emphasized Anderson's humanity and told the jury that there are "redeeming qualities worth saving in [Anderson]." She said that Anderson was "damaged" but not "unsalvageable." Gray reminded the jury that the law did not require them to "kill" Anderson, and she argued that he had taken full responsibility for what he did and "doesn't deserve to die." After hearing the

---

[2]One witness also read the transcript of another witness who had testified at Anderson's first penalty phase proceeding.

-3-

evidence, the jury found the same aggravating circumstance as that found at Anderson's first sentencing—the attempted murder of Solvey. The jury also found thirty mitigating circumstances. Nevertheless, after weighing the factors, it sentenced Anderson to death.

The Arkansas Supreme Court affirmed the sentence. *Anderson v. State*, 242 S.W.3d 229 (Ark. 2006). Anderson pursued post-conviction relief in Arkansas, and the Arkansas Supreme Court affirmed the denial of Anderson's petition for post-conviction relief. *Anderson v. State*, 385 S.W.3d 783 (Ark. 2011).

Anderson then filed a petition for federal habeas corpus relief in the United States District Court for the Eastern District of Arkansas. *See* 28 U.S.C. § 2254. The district court dismissed Anderson's petition and granted him a certificate of appealability on two of his claims. We later expanded his certificate of appealability to include the two additional claims he now raises on appeal. We consider each in turn.

## II.

Anderson claims that his counsel ineffectively failed to present or investigate certain mental health limitations. He argues that his counsel "unreasonably failed to present expert testimony" on the biological limitations of the teenage brain. He also argues that his counsel "unreasonably failed to identify" PTSD despite "ample evidence" of childhood abuse. Finally, he argues that his counsel "ignored obvious signs" of fetal alcohol spectrum disorder ("FASD") and that they should have requested neuropsychological testing, which would have revealed FASD.

During his § 2254 proceedings, Anderson presented an expert witness who testified that Anderson has "developmental" brain damage, which occurs "either perinatally or during development, fetal development, or early in childhood."

-4-

Another expert testified that Anderson has partial fetal alcohol syndrome. Anderson also presented an expert witness who diagnosed him with PTSD. Anderson claims that the fact that the jury did not have this information "undermines confidence in the verdict" because "the actions of others changed him physically in a way that's central to his moral culpability."

The district court held a four-day evidentiary hearing on Anderson's mental health claims and dismissed them as procedurally defaulted because he did not present them in state court and because it concluded that the claims were not substantial. We review "the factual findings of the district court for clear error" and "a finding of procedural default de novo." *Oglesby v. Bowersox*, 592 F.3d 922, 924 (8th Cir. 2010). On appeal, the parties agree that Anderson has procedurally defaulted his mental health claims. "If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted. We will not review a procedurally defaulted habeas claim because the state has been deprived of an opportunity to address the claim in the first instance." *Barrett v. Acevedo*, 169 F.3d 1155, 1161 (8th Cir. 1999) (en banc) (citation omitted).

The Supreme Court announced a narrow exception to this rule in *Martinez v. Ryan*, 566 U.S. 1 (2012). Substantial claims of ineffective assistance of counsel may overcome procedural default when the habeas claim arose in a state whose "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). A claim is substantial if it "has some merit." *Martinez*, 566 U.S. at 14. We previously concluded that Arkansas does not afford "meaningful review of a claim of ineffective assistance of trial counsel on direct appeal." *Sasser v. Hobbs*, 735 F.3d 833, 853 (8th Cir. 2013) (internal quotation marks omitted). We assume that Anderson has presented a substantial claim that excuses his procedural default and proceed to the merits.

-5-

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must also demonstrate that he was prejudiced. *Id*. at 692. Anderson's counsel's representation did not fall below an objective standard of reasonableness, and even if it did, Anderson has not demonstrated that he was prejudiced.

A.

Under *Strickland*, we first consider whether Anderson's counsel's representation fell below an objective standard of reasonableness. "An attorney's performance is deficient when he makes errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." *Holder v. United States*, 721 F.3d 979, 987 (8th Cir. 2013) (internal quotation marks omitted and alteration in original).

Anderson argues that his counsel should have presented more evidence on the biological limitations of the teenage brain. But Anderson's team offered Anderson's "youth . . . at the time of Clara Creech's murder" as a mitigating circumstance. And Dr. Speck-Kern testified to the jury that before the crimes occurred Anderson was acting on "a series of impulses" related to "frontal lobe function." She explained that the frontal lobe is not fully developed until "people are about twenty-five years old. And so, when people are older than that, they can use their brains a lot more effectively than they can when they're teenagers or children." She also told the jury that structure in a young person's life helps them make decisions but that Anderson did not have that structure "in a consistent way." Having presented such evidence, we conclude that counsel's decisions on the teenage brain evidence were "within the range of professionally reasonable judgments." *Bobby v. Van Hook*, 558 U.S. 4, 12 (2009) (per curiam).

Next, Anderson challenges his counsel's failure to investigate adequately PTSD and FASD. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. When assessing whether the investigation was reasonable, we must consider "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Anderson's counsel's performance was not deficient for failing to investigate PTSD. Anderson's counsel thoroughly explored and presented evidence of the effects of his childhood abuse on his adult life. Dr. Speck-Kern testified with the goal of "mak[ing] a connection between [Anderson's] childhood abuse and the crime that he committed." She explained to the jury that alcoholism was "a very big problem in [Anderson's] family." She testified that there was "a chronic level of depression in his life," that "things were hopeless for him most of the time," and that Anderson experienced a "real dip" in his depression around the time of the murder. And Maurice Anderson, Anderson's brother, testified at length about the abuse both he and Anderson suffered throughout their childhood.

Anderson argues that his counsel should have pursued a PTSD diagnosis because one psychologist they consulted, Dr. George Woods, sent the team articles about PTSD after Gray wrote him an email asking whether "black males have more difficulty showing emotion than females and other ethnicities." But Dr. Woods did not evaluate Anderson and did not recommend that the team have him tested for PTSD, and Anderson does not allege that any other expert made such a recommendation. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up . . . ." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Anderson's counsel's performance was also not deficient for failing to investigate evidence of FASD. Anderson argues that his counsel "ignored obvious signs of fetal-alcohol exposure." He claims his paternal grandmother told Gray and the team before the first trial that his mother was drinking around the time of his birth. His grandmother said only that she "didn't think [Anderson's mother] was a good pick" for her son because "[t]hey weren't ready for marriage." She explained that her son "drank heavily" and that Anderson's mother "was drinking too." However, she made no temporal connection between Anderson's birth and his mother's drinking. Anderson's brother also told Anderson's attorneys that his mother drank "a lot," and his cousin said that Anderson's mother is an alcoholic, but neither indicated that Anderson's mother drank while she was pregnant with Anderson. As the dissent notes, "no one specifically told counsel that [Anderson's mother's] drinking continued during pregnancy." *Infra*, at 20.

Anderson notes that, despite this evidence, his counsel did not ask his mother whether she drank while she was pregnant with Anderson, a question to which she admitted when asked by Anderson's habeas counsel. He also claims they should have administered neuropsychological testing, which would have revealed damage from fetal-alcohol exposure. Indeed, both Dr. Caperton and Dr. Speck-Kern suggested that neuropsychological testing might have been appropriate. But Dr. Caperton said only that "[i]t [wouldn't] hurt for [Anderson] to have a neuropsych exam." And according to Gray's notes from a later meeting, Dr. Speck-Kern told Gray that she had no reason to believe that Anderson's frontal lobe was damaged and that testing would be only "to rule out" frontal lobe damage.

Gray wrote both Dr. Speck-Kern and Dr. Caperton a letter asking for their opinions on Anderson's I.Q., whether he needed a neuropsychological evaluation, whether he had an anti-social personality disorder or a neuropsychological disorder, and whether they could make any connections between Anderson's "abusive childhood and his adult legal problems." She enclosed a number of materials with

each letter, including Anderson's school records, his I.Q. diagnosis, records showing that Anderson witnessed his mother's boyfriend abuse her, records showing that the boyfriend abused Anderson, testimony and a forensic evaluation from a psychologist, transcript testimony from all of the witnesses who had testified during the penalty phase of Anderson's first trial, and Dr. Derdeyn's report and meeting notes with Anderson.

Despite this information, neither Dr. Speck-Kern nor Dr. Caperton concluded that Anderson was brain damaged. Dr. Caperton said only that "[t]here's a chance [Anderson] suffered brain damage from the childhood abuse." And after reviewing Gray's notes from a meeting with her, Dr. Speck-Kern clarified that Anderson's low IQ "shows some cognitive limitations," but she observed that "[h]e doesn't appear to act as if he is suffering from major brain damage." Though she was given the opportunity, she did not correct Gray's note that "[Dr. Speck-Kern] doesn't think [Anderson] brain-injured, just never parented." Further, Dr. Derdeyn, who was board certified in psychiatry, neurology, child psychiatry, and forensic psychiatry, concluded that "there were no indications of disorders related to anxiety, psychosis or organicity." And Anderson cites no experts who indicated a potential FASD diagnosis to any member of the team.

These facts stand in contrast with the Tenth and Fourth Circuit cases Anderson cites. The Tenth Circuit expressed concerns about counsel's failure to order a neurological evaluation in *Littlejohn v. Trammell*, 704 F.3d 817, 862 (10th Cir. 2013). But in that case, an expert testified that the defendant had "neurological injury [originating] from birth," and the defendant's mother admitted to using drugs during her pregnancy. *Id.* (alteration in original). Likewise, the Fourth Circuit found that counsel was constitutionally deficient for not investigating whether the defendant had FASD where several witnesses testified that the defendant's mother drank while pregnant and where an expert concluded that the defendant "suffered neurological impairments as the result of frontal lobe damage and, consequently, had learning

difficulties." *Williams v. Stirling*, 914 F.3d 302, 306-07, 314-15 (4th Cir. 2019), *petition for cert. filed*, 87 U.S.L.W. 3470 (U.S. May 28, 2019) (No. 18-1495). Here, no expert concluded that Anderson had brain damage, nor did any definitive facts reveal that Anderson's mother drank while she was pregnant. The evidence Anderson's counsel did have did not amount to "red flags pointing up a need to test further." *See Rompilla*, 545 U.S. at 392 (internal quotation marks omitted).

We "indulg[e] a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." *Bucklew v. Luebbers*, 436 F.3d 1010, 1016 (8th Cir. 2006). Anderson's attorneys did conduct an investigation that "comprise[d] efforts to discover all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524 (emphasis omitted). They diligently consulted several experts, none of which diagnosed Anderson as brain damaged or expressed concerns about FASD despite the fact that Anderson's attorneys sent them testimony from Anderson's first penalty phase, which included testimony about the effects of alcohol on Anderson's childhood.

Though his case may have benefitted had his counsel investigated FASD, we consider "not what is prudent or appropriate, but only what is constitutionally compelled."[3] *Burger v. Kemp*, 483 U.S. 776, 794 (1987). In light of the facts that nobody told Anderson's attorneys his mother drank while she was pregnant and that the experts did not tell them he was brain damaged, it was not constitutionally deficient for his attorneys not to have further investigated FASD. *Cf. Marcrum v.*

---

[3]The dissent notes, and we emphasize, that the Supreme Court and this court have instructed repeatedly that the ABA Guidelines are "only guides to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (internal quotation marks omitted); *Roe v. Flores-Ortega*, 558 U.S. 470, 479 (2000) (explaining that "imposing specific guidelines on counsel is not appropriate" (internal quotation marks omitted)); *Kemp v. Kelley*, 924 F.3d 489, 501 (8th Cir. 2019); *Strong v. Roper*, 737 F.3d 506, 520 (8th Cir. 2013).

*Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) ("Where counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion."); *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008) (explaining that the defendant's counsel "reasonably relied" on an expert opinion that the defendant "suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder'"). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689. Thus, we conclude that Anderson's counsel's performance was not constitutionally deficient.

B.

Even if counsel were ineffective with regard to the mental health evidence, Anderson has not demonstrated prejudice. Anderson "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because Anderson challenges his sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. We must consider the "totality of the evidence before the . . . jury." *Id*.

First, Anderson has not shown that it is reasonably probable that the jury would have reached a different conclusion had they been presented with more evidence of the limitations of the teenage brain. Though Gray and her team may not have explained the biological difference between nineteen-year-old brains and older brains as thoroughly as Anderson argues they should have, Dr. Speck-Kern sufficiently presented the issue, as outlined above.

-11-

Second, Anderson has not shown that it is reasonably probable that the jury would have reached a different conclusion had it been presented with evidence of a PTSD diagnosis. Based on the evidence presented to it, the jury found thirty mitigating circumstances relating to PTSD, including that Anderson "grew up in . . . abusive, neglectful households, where caretakers showed little or no affection to him," that his mother was diagnosed as mentally retarded and "intellectually incapable of providing adequate care or protection for" Anderson, that he witnessed his mother's boyfriend verbally and physically abuse his mother and brother, that he was physically abused, that he "has a family history of alcoholism," that he "lived in at least nine different places between the ages of five and sixteen," that Anderson's birthdays were not celebrated and that he was not given presents, and that he "never had a stable home life." At least one but not all of the jurors found that "Anderson was under extreme emotional distress" and that he "was acting under unusual pressures or influences" at the time of the crime. We agree with the district court that Anderson's counsel may have "missed the label . . . but they told the story."

Third, Anderson has not shown that it is reasonably probable that the jury would have reached a different conclusion had they been presented with evidence of FASD. Anderson's counsel presented an extensive mitigation case that convinced the jury to find *thirty* mitigating circumstances. And the jury heard related evidence on Anderson's brain limitations because Dr. Speck-Kern testified that his frontal lobe was not fully developed given his age at the time of the offense. Based on the "totality of the evidence before the . . . jury," Anderson has not demonstrated a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" had it been presented with one more mitigating circumstance, evidence of FASD, nor has he shown that the mitigating circumstances would have outweighed the aggravating circumstance had the jury been presented with evidence of PTSD and the teenage brain. *See Strickland*, 466 U.S. at 695.

## III.

Anderson next argues that his counsel was ineffective because they presented the jury with a report from Dr. Speck-Kern that said, "Mr. Anderson stated that he has been on Death Row since January 2001." Anderson claims the statement "undermine[d] the . . . jury's sense of responsibility for its verdict" because it alerted the jury that a different jury had already sentenced Anderson to death.

The district court determined that Anderson's claim was procedurally defaulted because he did not present it in state court and because it was not substantial. As with his mental health claims, we review "a finding of procedural default de novo," *Oglesby*, 592 F.3d at 924, and we must consider whether Anderson has presented a "substantial" claim to overcome procedural default, *Martinez*, 566 U.S. at 14. We assume that Anderson's claim is substantial, thereby overcoming his procedural default, and conclude that the claim fails on the merits because he has not demonstrated that he was prejudiced. *See Strickland*, 466 U.S. at 687 (explaining that the defendant must show deficient performance and prejudice).

Under *Strickland*, Anderson must prove prejudice. *Id*. But the Supreme Court has explained that "it is impossible to know" how evidence of a defendant's prior death sentence "might have affected the jury." *Romano v. Oklahoma*, 512 U.S. 1, 13-14 (1994). In *Romano*, the state introduced during the sentencing phase a copy of the judgment and death sentence the defendant received in a prior trial. *Id*. at 3. The defendant argued that the evidence undermined the jury's "sense of responsibility for determining the appropriateness of the death penalty." *Id*. But the Supreme Court explained that to find the sentencing proceeding "fundamentally unfair would . . . be an exercise in speculation, rather than reasoned judgment." *Id*. at 14. It therefore declined to hold the defendant's sentencing proceeding fundamentally unfair. *Id*.

-13-

It is similarly unclear whether the statement in Dr. Speck-Kern's report influenced the jury. Indeed, the jury may not have even understood the statement that Anderson "had been on Death Row" to mean that he had been previously sentenced to death. It may have instead assumed he was on death row simply because he was charged with a capital offense. It is also possible that the jury never noticed the statement. Thus, Anderson has not demonstrated prejudice because he has not met his burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) ("Since appellant offers only speculation that he was prejudiced by the failure of his counsel to interview [a potential witness], he has not made the required showing of prejudice under *Strickland*."); *Kennedy v. Kemna*, 666 F.3d 472, 479 (8th Cir. 2012) (explaining that the defendant's "theory of prejudice [was] rife with speculation").

## IV.

Next, Anderson argues that the trial court erroneously instructed the jury to consider an improper aggravating factor. During penalty phase deliberations, the jury asked the trial judge for clarification regarding verdict form 3(b). Form 3(b) asked the jury to determine whether the "aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by any juror to exist." The jury said it needed "clarification for the aggravating circumstances" and asked whether it should consider "the Roger Solvey circumstance, the Clara Creech circumstances, or both of them."

The trial court explained that because the jury had already determined the aggravating circumstance on a prior form, which the trial court reasoned was a threshold issue, the jury "should be allowed to consider all of the . . . properly admitted evidence, or else it shouldn't have been admitted in the first place." Thus,

-14-

the trial court told the jury that it "may consider all of the evidence and give it whatever weight that you believe appropriate in answering form three B, and following." Anderson argues that this amounted to an instruction to weigh the "Creech circumstances" as an aggravating factor.

Anderson claims that the "Creech circumstances" do not fit under any of the ten enumerated aggravating factors that Arkansas law permits juries to consider. *See* Ark. Code Ann. § 5-4-604. He therefore concludes that the trial court's instruction was a constitutional error. *See Brown v. Sanders*, 546 U.S. 212, 221 (2006) (explaining that weighing an improper aggravating factor will "give rise to constitutional error[] only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor"). The district court determined that Anderson's claim is procedurally defaulted, and we agree.[4]

We review a "finding of procedural default de novo." *Oglesby*, 597 F.3d at 924. "Before seeking habeas corpus relief under § 2254, a prisoner ordinarily must fairly present his federal claims to the state courts." *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (internal quotation marks omitted). "This requirement serves the salutary purpose of giving states the opportunity to pass upon and correct alleged violations of [their] prisoners' federal rights." *Id*. (internal quotation marks omitted and alteration in original).

Anderson did not fairly present his "Creech circumstances" argument in state court. Before the Arkansas Supreme Court, Anderson took issue with the admission of victim impact evidence—testimony from five witnesses, "each of whom gave an extensive history of Mrs. Creech's life and discussed the impact of her death on

---

[4]The *Martinez* exception applies to ineffective assistance of counsel claims and is inapplicable here. *See Trevino*, 569 U.S. at 422-23.

everyone from themselves, to other family members, to her church family, to society in general." Anderson's relevant argument heading read, "The trial court erred in failing to grant appellant's motions to prohibit victim impact and 'other evidence.' Alternatively, the trial court erred by instructing the jury to consider all evidence presented as aggravating circumstances to be weighed against the mitigators in determining appellant's eligibility for the death penalty."

After a lengthy argument that the trial court should not have allowed the introduction of victim impact evidence, Anderson turned to his alternative argument, claiming only that "[t]he [t]rial [c]ourt erred by instructing the jury to treat [sic] weigh victim impact evidence as an aggravating circumstance against the mitigating circumstances they found to exist" and that "the trial court erred in directing the jury to prematurely weigh the victim impact evidence." His state court briefing urged the Arkansas Supreme Court to overturn a line of cases explicitly dealing with victim impact evidence. He also argued that the "uniqueness and goodness of . . . Creech and the impact her death had on her family" should have been weighed only after weighing aggravators and mitigators. While his heading initially indicated that the trial court should not have instructed the jury to consider "all of the evidence," he later narrowed his focus, arguing only that it should not have been instructed to consider the victim impact evidence.

For the first time, Anderson presents a different argument—that the jury could not consider the "Creech circumstances," which he says involves "the evidence of Clara Creech's killing." But the evidence about Creech's killing is different from the evidence of how that killing affected those close to her. Nevertheless, Anderson argues that his state court briefs "refer, somewhat confusingly, to the 'Clara Creech circumstances' as 'victim impact evidence'" and that he is only reformulating his argument on appeal. But Anderson's briefing to the Arkansas Supreme Court made clear that he used the term "victim impact" in its conventional sense—the testimony of the five witnesses about Creech's life and the impact of her death. His state briefs

did not use the term "victim impact" to refer to "the evidence of Clara Creech's killing." Further, Anderson did not seek a certificate of appealability on whether the jury was erroneously instructed to consider the victim impact evidence as an aggravating factor.

Anderson also argues that his "Creech circumstances" claim is not procedurally defaulted because he referred to a "specific federal constitutional right" violated by considering the victim impact evidence as an aggravating factor—the same constitutional rights he claims are violated by considering the "Creech circumstances" as an invalid aggravating factor. *See Murphy v. King*, 652 F.3d 845, 849 (8th Cir. 2011). But "[p]resenting a claim to the state courts that is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." *Abdullah v. Groose*, 75 F.3d 408, 412 (8th Cir. 1996); *see also Forest v. Delo*, 52 F.3d 716, 719 (8th Cir. 1995) (explaining that the defendant's claim was procedurally defaulted because he argued before the state court that his attorney coerced his guilty plea, not that the trial judge coerced his guilty plea as he argued in federal court). Thus, because Anderson did not present his "Creech circumstances" argument to the state court, we conclude that Anderson's claim is procedurally defaulted.

But even if we assume that Anderson fairly presented his claim to the state court, his claim nevertheless fails. Considering an aggravating factor in violation of a state statute alone does not amount to a constitutional violation meriting federal habeas relief. *See Barclay v. Florida*, 463 U.S. 939, 956-57 (1983) (plurality opinion) (explaining that the plurality in a prior case "saw no constitutional defect" in a sentence based on both aggravating factors properly considered under state law and an aggravating factor not listed in the state statute); *Moore v. Mitchell*, 708 F.3d 760, 798 (6th Cir. 2013); *Lesko v. Owens*, 881 F.2d 44, 59 (3d Cir. 1989) (noting that the Supreme Court in *Barclay* "held that although the state sentencing statute forbid the jury to consider defendant's prior criminal record, this violation of state law did not violate the federal constitution"); *Shriner v. Wainwright*, 715 F.2d 1452, 1458

-17-

(11th Cir. 1983) ("Even if the judge considered a nonstatutory aggravating factor, this error of state law does not rise to the level of a constitutional violation requiring federal habeas corpus relief."); *Barfield v. Harris*, 719 F.2d 58, 61 (4th Cir. 1983). And the Supreme Court has held that a jury may properly "consider the circumstances of the crime in deciding whether to impose the death penalty." *Tuilaepa v. California*, 512 U.S. 967, 976 (1994). Thus, Anderson's claim likewise fails on the merits.

## V.

Finally, Anderson argues that his youth at the time of the offense and serious mental illnesses categorically exempt him from the death penalty. He argues that though he procedurally defaulted these claims by failing to present them in state court, he claims they are novel, providing him with "cause" for his default, and he argues that we should remand his case for a hearing on prejudice. *See Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("[W]hen a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice."). The district court disagreed, determining that the tools to construct the arguments were available to Anderson when his case was pending in state court. It therefore dismissed his claim as procedurally defaulted. We agree.

In *Reed v. Ross*, 468 U.S. 1, 16 (1984), the Supreme Court held that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." The Court previously "identified three situations in which a new constitutional rule, representing a clear break with the past, might emerge." *Id.* at 17 (internal quotation marks omitted) (citing *United States v. Johnson*, 457 U.S. 537, 549 (1982)). Anderson argues that his claims fall within the second situation, where a Supreme Court decision overturns "a longstanding and

widespread practice to which [the Supreme Court] has not spoken, but which a near-unanimous body of lower court authority has expressly approved." *Id*. But Anderson does not identify a Supreme Court decision that fits within *Reed*'s second category.

Further, we have explained that "[i]f the tools were available for a petitioner to construct the legal argument at the time of the state appeals process, then the claim cannot be said to be so novel as to constitute cause for failing to raise it earlier." *Frizzell v. Hopkins*, 87 F.3d 1019, 1021 (8th Cir. 1996) (internal quotation marks omitted). The Supreme Court categorically exempted the execution of offenders under the age of eighteen in *Roper v. Simmons*, 543 U.S. 551, 575 (2005), six months before Anderson's resentencing took place in September 2005. The Supreme Court categorically exempted an insane person from the death penalty in 1986, and it categorically exempted persons with intellectual disabilities in 2002. *See Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The tools were available to Anderson to make his arguments before the state court. He has thus not shown cause, and his procedural default is not excused.

## VI.

For the foregoing reasons, we affirm.

KOBES, Circuit Judge, concurring in part and dissenting in part.

I join the majority's well-reasoned opinion on all but one issue. In my view, counsel's failure to investigate Anderson's fetal alcohol spectrum disorder (FASD) was unreasonable and prejudicial. By the time of Anderson's second penalty-phase trial in 2005, it was common practice for the capital bar to investigate FASD. Anderson's attorneys failed to do so despite significant evidence of his mother's alcohol abuse. This failure likely prejudiced Anderson because evidence of FASD is more powerful than any of the mitigating evidence presented at his resentencing.

I.

FASD is a form of organic brain damage that affects the ability to make decisions, communicate, and control emotions. *See* App. I520–22. We now know that Anderson's mother drank while pregnant and Anderson has FASD as a result. App. I337. The court forgives his defense team's failure to discover this before sentencing because evidence of his mother's drinking "did not amount to red flags pointing up a need to test further." Maj. Op. 10 (citation omitted). I respectfully disagree.

Anderson's childhood was soaked in alcohol—and his attorneys knew it. His defense team heard several of Anderson's relatives describe his mother, Ruby, as a heavy drinker or an alcoholic. His grandmother explained that when she was with Jerry Anderson, Anderson's father, Jerry drank heavily and "Ruby was drinking too." App. AA1. Anderson's older brother reported that when she was with Amos Strickland, "Ruby and Amos drank a lot." App. AA3. His half-sister also told counsel that Ruby drank, App. Z26, and one of his cousins referred to her as a "heavy drinker[]" and "an alcoholic" who "drinks just as much as Jerry did," App. Z27, Z29, AA6.

The court discounts this evidence because the witnesses "made no temporal connection between Anderson's birth and his mother's drinking" and did not explicitly "indicate[] that Anderson's mother drank while she was pregnant with Anderson." Maj. Op. 8. Though it is true that no one specifically told counsel that Ruby's drinking continued during pregnancy, some of the descriptions were so tied to Anderson's infancy that counsel should have investigated further. Anderson's brother, for example, said his mother drank heavily when she was with Amos Strickland, which was during the earliest years of Anderson's life. And although his grandmother's statements to counsel were ambiguous about timing (Anderson's mother appears to have been with Jerry Anderson prior to Anderson's birth but only

-20-

married him years later), she reasonably might have been describing the period leading up to Anderson's birth. Ambiguity remains because Anderson's attorneys failed to ask obvious follow-up questions. Then there was the other evidence that should have impressed on his attorneys the prevalence of alcohol in Anderson's childhood. For example, his counsel knew that once, when he talked back while picking up the empty beer cans scattered "any and everywhere," Amos tried to punish him by throwing a full beer bottle that narrowly missed him. App. M213.

Counsel had a duty to conduct an investigation that "comprise[d] efforts to discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis omitted). A thorough investigation is especially important in capital cases. *See Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake, we believe that it was the duty of [the defendant's] lawyers to collect as much information as possible . . . for use at the penalty phase of his state court trial."). Failure to fully develop the facts is reasonable only if "professional judgments support the limitations on [the] investigation." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Here there was no judgment behind counsel's failure to investigate FASD. Anderson's lead mitigation attorney acknowledged the team "did not consider the possibility that [Anderson] might have been exposed to alcohol *in utero* or that he suffered from fetal alcohol syndrome. . . . It just isn't something we considered one way or the other." App. Z119, Z121. That is not the sort of "professional judgment" that *Strickland* permits.

The failure to explore Anderson's prenatal exposure to alcohol is notable given the state of FASD-based mitigation strategies at the time of Anderson's resentencing in 2005. The 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines), which are a "guide[] to determining what is reasonable" in this case, *Strickland*, 466 U. S. at 688, recognized FASD's value as a defense and recommended that all capital

-21-

defense teams include at least one person qualified to screen for FASD,[5] ABA Guidelines, *reprinted in* 31 Hofstra L. Rev. 913, 956–57 (2003); *see also*, *id.* at 1022 (mitigation cases depend on "extensive and generally unparalleled investigation into personal and family history" that "begins with the moment of conception") (citations omitted). And although the Supreme Court has cautioned that the ABA Guidelines are "only guides" to what is reasonable, *Strickland*, 466 U.S. at 688, other facts underscore that FASD was established as a mitigation strategy by the time of Anderson's resentencing. For example, his expert testified before the district court that by the 1990s the FASD defense was well-recognized by the capital defense bar, App. I59–60, and Arkansas case law records attempts to use it as early as 1995, *see Miller v. State*, 942 S.W.2d 825, 828 (Ark. 1997). Given all of this, it was unreasonable for counsel not to ask Anderson's mother whether she drank while pregnant.

The majority deflects blame from Anderson's attorneys by shifting focus to the experts his attorneys retained and *their* failure to identify FASD. But Anderson has pleaded ineffective assistance of counsel, not ineffective assistance of experts. The duty to investigate mitigation defenses in capital cases is borne by counsel. *See, e.g.*, *Strickland*, 466 U.S. at 691; *Kayer v. Ryan*, 923 F.3d 692, 713 (9th Cir. 2019); *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005). Anderson's experts did not have access to everything that counsel did and, more importantly, they lacked the most valuable evidence in this case—Ruby's admission that she drank while pregnant—because counsel failed to uncover it. In capital cases, attorneys often enlist experts to help them decide which defenses to present and what threads to pull at. But experts can only give effective guidance when they have enough information. When counsel fail to ask important questions and turn up crucial facts, that failure cannot be shifted to experts.

---

[5] Anderson's team did not include a qualified person. App. Z18–19.

II.

I also respectfully disagree with the court that "Anderson has not shown that it is reasonably probable that the jury would have reached a different conclusion" if Anderson's counsel had presented evidence of FASD. Maj. Op. 11. The court notes that the jury found thirty mitigating circumstances and still sentenced Anderson to death. It concludes that it is not reasonably probable that "one more mitigating circumstance" would have made a difference. *Id.* But evidence of Anderson's FASD is more than "one more" mitigation argument.

In my view, the court artificially inflates Anderson's mitigation case. Although numerous, the mitigators were duplicative and focused primarily on his traumatic and unstable home life. *See* App. T2–T14. For example, "Justin Anderson never had a stable home life," "Justin Anderson attended up to five different school districts from Kindergarten to the 8th grade," and "Justin Anderson lived in at least nine different places between the ages of 5 and 16," were three *different* mitigating factors. App. T8–T9.

It's not just the quantity, but the quality of mitigating evidence that can make the difference between life and death. *See Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). Compared to Anderson's mitigators, an FASD diagnosis would offer something different and more compelling. The ABA Guidelines recognize the significance of an FASD diagnosis, explaining that "the permanent neurological damage caused by fetal alcohol syndrome" could "lessen the defendant's moral culpability for the offense or otherwise support[] a sentence less than death." ABA Guidelines, *supra*, at 1060–61. That brain damage presents a different and more powerful type of mitigating evidence is a theme throughout capital caselaw. *See Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (describing the way that brain damage caused by FASD diminished the defendant's "capacity to appreciate the criminality of his conduct or conform his conduct to the law"); *Littlejohn v. Trammell*, 704 F.3d

817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."). The Fourth Circuit recently explained the power of an FASD diagnosis, noting that such evidence "was different from the other evidence [presented to the jury] because it could have established *cause and effect* for the jury," effectively explaining *why* the defendant had committed the crime. *Williams v. Stirling*, 914 F.3d 302, 318 (4th Cir. 2019). "Without [the FASD diagnosis], the jury . . . would have assigned greater moral culpability to [the defendant] for his criminal behavior." *Id.*

So too, here. The jury was presented with much mitigating evidence, but nothing with the force of an FASD diagnosis. As Anderson's lead mitigation attorney admitted, evidence of FASD would have fit perfectly with the theme of the mitigation defense: "Childhood Matters." App. Z20. It would have significantly bolstered that defense, explaining not just that Anderson had a horrible childhood, but that it changed him physically. With the addition of this evidence, there is a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Anderson has demonstrated prejudice.

\* \* \*

Anderson has established ineffective assistance of counsel on the narrow issue of his counsel's failure to fully investigate his exposure to alcohol *in utero*. I echo the Fourth Circuit in *Williams*:

> [M]ost of trial counsels' decisions and actions on issues unrelated to [FASD] *did* bear the hallmarks of effective assistance: trial counsel had experience in capital cases; counsel consulted with numerous experts in developing a mitigation case; and counsel spent a significant amount of time developing mitigation arguments. But as *Wiggins* makes abundantly clear, an inadequate

-24-

investigation into potentially mitigating evidence can be, by itself, sufficient to establish deficient performance.

914 F.3d at 313–14 (citations omitted). Because Anderson has shown that failure to investigate FASD likely prejudiced his mitigation case, I respectfully dissent.

_____